

1 | NICOLA T. HANNA
United States Attorney
2 | LAWRENCE S. MIDDLETON
Assistant United States Attorney
3 | Chief, Criminal Division
BENJAMIN R. BARRON (Cal. Bar No. 257094)
4 | Assistant United States Attorney
Deputy Chief, OCDETF Section
5 |     1400 United States Courthouse
312 North Spring Street
6 |     Los Angeles, California 90012
Telephone:   (213) 894-3542
7 |     Facsimile:   (213) 894-0142
E-mail:      ben.barron@usdoj.gov
8 |
Attorneys for Applicant
9 | UNITED STATES OF AMERICA



10 |

11 |                 UNITED STATES DISTRICT COURT

12 |         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 | IN RE: CELLULAR TELEPHONES         No. 19MJ00029

14 |                                    GOVERNMENT'S *EX PARTE* APPLICATION
15 |                                    FOR A WARRANT AUTHORIZING THE
DISCLOSURE OF HISTORICAL CELL-SITE
INFORMATION AND REQUEST TO SEAL;
AFFIDAVIT OF LINDSAY T. BURNS

16 |                                    **(UNDER SEAL)**

17 |

18 |

19 |      The United States of America, by and through its counsel of

20 | record, the United States Attorney for the Central District of

21 | California, hereby applies for a warrant requiring cellular

22 | telephone service provider(s) to furnish the Drug Enforcement

23 | Administration (the "Investigating Agency") with information

24 | relating to the following cellular telephones:

25 |      a.   916-759-3780, a cellular telephone issued by Verizon

26 | Wireless ("Carrier 1"), with international mobile equipment identity

27 | ("IMEI") number 355832083058955, used by Grace Anabel Montgomery

28 | ("**Subject Telephone 1**");

b.   310-990-6424, a cellular telephone issued by AT&T Wireless ("Carrier 2" and, collectively with Carrier 1, the "Carriers"), believed to be used by Trent Michael TOMASOVICH ("**Subject Telephone 2**");

c.   206-579-0454, a cellular telephone issued by Verizon Wireless, with international mobile equipment identity ("IMEI") number 353051098439355, believed to be used by Kristen WHITE ("**Subject Telephone 3**");

d.   714-600-5998, a cellular telephone issued by AT&T Wireless, believed to be used by Ian Flynn ("**Subject Telephone 4**");

e.   818-960-8483, a cellular telephone issued by AT&T Wireless, believed to be used by Joseph CAMPBELL ("**Subject Telephone 5**" and, together with **Subject Telephones 1 through 4**, the "**Subject Telephones**").

Specifically, authorization is sought to obtain historical cell-site information, that is, information reflecting the location of cellular towers (cell-site and sector/face) related to the use of the **Subject Telephones** ("cell-site information"), to include call detail, text, and data information, for the **Subject Telephones** that was gathered by the Carriers from July 1, 2017 through the present (as to **Subject Telephone 2**), and from July 10, 2018 through July 17, 2018 (as to **Subject Telephones 1, 3, 4, and 5**), along with any other associated data that was collected by the Carriers, but not including the contents of any communication.

The application is made in connection with an investigation of offenses committed by Trent Michael TOMASOVICH and others known and unknown (the "Target Subjects"), specifically, violations of 21 U.S.C. §§ 841(a)(1) and 846 (distribution of controlled substances,

including distribution causing overdose death, and conspiracy to distribute and to possess with intent to distribute controlled substances) (the "Target Offenses"), and is based upon the attached agent affidavit. There is probable cause to believe that federal crimes have been committed and that the requested historical cell-site information will constitute or yield evidence of those crimes.

The information sought by this application first includes information about the location (physical address) of the "cell-sites" concerning the cell-sites/sectors that received or transmitted signals to and from the **Subject Telephones** during the requested period. This information, which is acquired in the first instance by the Carriers, includes any information, apart from the content of any communication, that is reasonably available to the Carriers and that is requested by the Investigating Agency, concerning the cell-sites/sectors receiving and transmitting signals to and from the **Subject Telephones**. This historical information is sought based on 18 U.S.C. § 2701 et seq. (the "Stored Communications Act"). The Stored Communications Act provides:

> A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only[1] when the governmental entity --
>
> > (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction[.]

---

[1] This section also provides other methods to compel disclosure, including via subpoena or court order. However, the government in this case is proceeding under the highest threshold, that is, obtaining a warrant as described in § 2703(c)(1)(A).

18 U.S.C. § 2703(c)(1); see also Carpenter v. United States, ___

S. Ct. ___, 2018 WL 3073916 (June 22, 2018) (holding that a warrant

is required to obtain seven or more days' worth of historical cell-

site information).[2]

Cellular telephone companies routinely create and maintain, in

the regular course of their business, records of information

concerning their customers' usage.  These records typically include

for each communication a customer makes or receives (1) the date and

time of the communication; (2) the telephone numbers involved;

(3) the cell tower to which the customer connected at the beginning

of the communication; (4) the cell tower to which the customer was

connected at the end of the communication; and (5) the duration of

the communication.  The records may also, but do not always, specify

---

[2] The definition of terms in the Stored Communications Act makes
clear that the "record or other information" that a court may order
a provider to disclose to the government under Section 2703(c)(1)(A)
includes both cell site and other location information.  First, the
Stored Communications Act expressly adopts the definition of
statutory terms set forth in 18 U.S.C. § 2510.  See 18 U.S.C. § 2711
("As used in this chapter. . . (1) the terms defined in section 2510
of this title have, respectively, the definitions given such terms
in that section").  Thus, the term "provider of electronic
communication service" used in Section 2703(c) covers cellular
telephone service providers, because 18 U.S.C. § 2510(15) defines
"electronic communications service" as "any service which provides
to users thereof the ability to send or receive wire or electronic
communications."  18 U.S.C. § 2510(15).  Further, cell site and
other location information is "a record or other information
pertaining to a subscriber to or customer of" an electronic
communications service – another term used in Section 2703(c) –
because cellular telephone service providers receive and store the
information, if sometimes only momentarily, before forwarding it to
law enforcement officials.  See In Re: Application of the United
States for an Order for Prospective Cell Site Location Information
on a Certain Cellular Telephone, 460 F. Supp. 2d 448, 457-60
(S.D.N.Y. 2006).  Finally, this Court is a "court of competent
jurisdiction" because it is a "district court of the United States
(including a magistrate judge of such a court) . . . that . . . has
jurisdiction over the offense being investigated."  18 U.S.C.
§ 2711(3)(A)(i).

a particular sector of a cell tower used to transmit a communication.  Cell-site information is useful to law enforcement because of the limited information it provides about the general location of a cell phone when a communication is made.

Pursuant to 18 U.S.C. § 2705(b), this application requests that the Court enter an order commanding the Carriers not to notify any person, including the subscriber(s) of the **Subject Telephones**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carriers comply with the warrant or such later date as may be set by the Court upon application for an extension by the United States, for the reasons outlined in the attached agent affidavit.

This application also seeks an order that: (1) authorizes the disclosure of the requested information, whether the **Subject Telephones** are located within this District, outside of the District, or both, pursuant to 18 U.S.C. § 2703(c)(1)(A) and Rule 41(b), and, for good cause shown, at any time of the day or night pursuant to Rule of Criminal Procedure 41; (2) authorizes the disclosure of not only information with respect to the **Subject Telephones**, but also with respect to any changed telephone number(s) assigned to an instrument bearing the same ESN, IMSI, or IMEI ("unique identifying number") as any **Subject Telephone**, or any changed unique identifying number subsequently assigned to the same telephone number as any **Subject Telephone**, or any additional changed telephone number(s) and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same wireless telephone account number as any **Subject Telephone** within

the period of disclosure authorized by the warrant; and (3) orders the Investigating Agency to reimburse the Carriers for their reasonable expenses directly incurred in providing the requested information and any related technical assistance.

Finally, this application requests that it, the proposed warrant that has been concurrently lodged, and the return to the warrant be sealed by the Court until such time as the Court directs otherwise. Allowing disclosure to the public at large would likely jeopardize the ongoing investigation for the reasons outlined in the attached agent affidavit.

Dated: January 4, 2019                    Respectfully submitted,

                                          NICOLA T. HANNA
                                          United States Attorney

                                          LAWRENCE S. MIDDLETON
                                          Assistant United States Attorney
                                          Chief, Criminal Division


                                          _/s/ Benjamin R. Barron_
                                          BENJAMIN R. BARRON
                                          Assistant United States Attorney

                                          Attorneys for Applicant
                                          UNITED STATES OF AMERICA

<div align="center">AFFIDAVIT</div>

I, Lindsay T. Burns, being duly sworn, declare and state as follows:

<div align="center">I.   INTRODUCTION</div>

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the narcotics offenses enumerated in Title 18, United States Code Section 2516. Additionally, I have received certification from the California Attorney General to conduct wiretaps as authorized in Section 629.50 et seq. of the California Penal Code.

2.   I have been employed as a DEA Special Agent since June 2010.  I received five months of training at the Department of Justice Training Center, and I have participated in dozens of narcotics investigations as the case agent or as an investigating agent.  I have debriefed defendants and witnesses who had personal knowledge regarding narcotics trafficking organizations. Additionally, I have participated in many aspects of narcotics investigations, including conducting wiretap investigations, physical surveillance, search warrants, and arrests.

3.   I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") division, which is an enterprise operated through the DEA, Los Angeles HIDTA Office.  Additionally, I am a member of the HIDTA Opioid Response Team ("ORT") HIDTA Group 45, which is tasked with the investigation of suspected opioid-related overdose deaths in Los Angeles County.  HIDTA Group 45 is comprised

of DEA special agents and local law enforcement officers designated
as Task Force Officers ("TFOs").

4.   Unless otherwise noted, when I assert that a statement was
made, the information was provided by another law enforcement
officer (who may have had either direct or hearsay knowledge of the
statement) to whom I have spoken or whose report I have read and
reviewed.   Likewise, information resulting from surveillance, except
where otherwise indicated, does not necessarily set forth my own
observations, but rather has been provided directly or indirectly by
DEA Special Agents or other law enforcement officers who conducted
such surveillance.

## II. PURPOSE OF AFFIDAVIT

5.   This affidavit is made in support of an application for a
warrant authorizing the disclosure of historical cell-site
information, to include call detail, text, and data information,
for:

a.   916-759-3780, a cellular telephone issued by Verizon
Wireless, with international mobile equipment identity ("IMEI")
number 355832083058955, used by Grace Anabel Montgomery ("**Subject
Telephone 1**");

b.   310-990-6424, a cellular telephone issued by AT&T
Wireless, believed to be used by Trent Michael TOMASOVICH ("**Subject
Telephone 2**");

c.   206-579-0454, a cellular telephone issued by Verizon
Wireless, with international mobile equipment identity ("IMEI")
number 353051098439355, believed to be used by Kristen WHITE
("**Subject Telephone 3**");

1       d.   714-600-5998, a cellular telephone issued by AT&T

2  Wireless, believed to be used by Ian Flynn (**"Subject Telephone 4"**);

3       e.   818-960-8483, a cellular telephone issued by AT&T

4  Wireless, believed to be used by Joseph CAMPBELL (**"Subject Telephone**

5  **5"** and, together with **Subject Telephones 1 through 4**, the **"Subject**

6  **Telephones"**).

7      6.   This affidavit further requests that the warrant authorize

8  disclosure of such historical cell-site information for the

9  following date ranges: (1) as to **Subject Telephone 2**, from July 1,

10  2017, to the present; (2) as to **Subject Telephones 1, 3, 4, and 5**,

11  from July 10, 2018 through July 17, 2018.

12      7.   As described more fully below, I respectfully submit there

13  is probable cause to believe that cell-site information likely to be

14  received concerning the approximate location of the **Subject**

15  **Telephones**, will constitute or yield evidence of violations of 21

16  U.S.C. §§ 841(a)(1) and 846 (distribution of controlled substances,

17  including distribution causing overdose death, and conspiracy to

18  distribute and to possess with intent to distribute controlled

19  substances), that were committed by Trent Michael TOMASOVICH and

20  others known and unknown (the "Target Subjects").

21      8.   The facts set forth in this affidavit are based upon my

22  personal observations, my training and experience, and information

23  obtained from various law enforcement personnel and witnesses.  This

24  affidavit is intended to show merely that there is sufficient

25  probable cause for the requested warrant and does not purport to set

26  forth all of my knowledge of, or investigation into, this matter.

27  Unless specifically indicated otherwise, all conversations and

28

1  statements described in this affidavit are related in substance and

2  in part only.

3  <center>III. STATEMENT OF PROBABLE CAUSE</center>

4  A.  Summary

5  9.  I am investigating the narcotics overdose deaths of 24-

6  year-old victim Grace Anabel Montgomery ("Montgomery") and 38-year-

7  old victim Ian Flynn, each of which occurred on or about July 14,

8  2018.  Based on evidence set forth herein, I submit that there is

9  probable cause to believe that (1) Trent Michael TOMASOVICH

10  ("TOMASOVICH") is a drug trafficker who supplied drugs to Montgomery

11  on or about July 13, 2018, (2) those drugs caused Montgomery to

12  suffer a fatal overdose on July 14, 2018, after she consumed them

13  and (3) those same drugs also caused Flynn to suffer a fatal

14  overdose on July 14, 2018.

15  10.  Specifically, as set forth below, on July 13, 2018,

16  Montgomery, a recovering heroin addict, used her cellphone (**Subject**

17  **Telephone 1**) to reached out to CAMPBELL (**Subject Telephone 5**)

18  seeking heroin.  CAMPBELL in turn referred Montgomery to "Trent"

19  (TOMASOVICH) at **Subject Telephone 2**.  TOMASOVICH has a history of

20  opiate trafficking, including a recent conviction for selling heroin

21  out of his Sherman Oaks residence.  TOMASOVICH informed Montgomery

22  that he could sell her fentanyl, a synthetic opioid that is fifty

23  times more powerful than heroin, following which they arranged to

24  meet at the Sherman Oaks family entertainment center Castle Park to

25  complete the transaction.  After purchasing the fentanyl, Montgomery

26  went to the Woodland Hills residence of her friend, Kristin White;

27  subscriber records confirm that White uses **Subject Telephone 3**.

28  White ultimately found Montgomery in a bathroom in the residence,

<center>4</center>

1  unresponsive, and called for emergency medical services; after being
2  transported to a hospital in the early morning hours of July 14,
3  2018, Montgomery was later pronounced dead of a drug overdose.
4  White's boyfriend, Flynn, was present at White's residence and found
5  the baggie of fentanyl that Montgomery had just purchased from
6  TOMASOVICH.  White told Flynn to dispose of the powder, but Flynn
7  instead consumed some of the fentanyl and suffered an overdose,
8  which resulted in his own overdose death shortly thereafter.
9  Following his death, Flynn's parents provided his cellphone to
10  investigators and identified **Subject Telephone 4** as Flynn's phone
11  number (i.e., the phone number associated with it); I conducted a
12  query of a law enforcement public records database and verified that
13  **Subject Telephone 4** was Flynn's phone number.

14        B.   Other Law Enforcement Investigations of TOMASOVICH

15        11.  TOMASOVICH has a long history of being investigated by law
16  enforcement for narcotics trafficking, including the following,
17  which I know from my communication with other law enforcement
18  officers or review of various underlying reports:

19            a.   In 2017, the DEA in Ventura conducted a wiretap
20  investigation of a heroin delivery service that operated throughout
21  much of the Central District of California.  The wiretaps,
22  authorized by the Honorable S. James Otero, United States District
23  Judge, were signed on the following dates, each authorizing 30-day
24  interception periods: CM 17-0987 on July 28, 2017; CM 17-0987A on
25  August 30, 2017; and CM 17-0987B on October 2, 2017.  TOMASOVICH,
26  using **Subject Telephone 2** was intercepted throughout the
27  interception periods ordering and coordinating the delivery of
28  narcotics; I have reviewed linesheet summaries of the communications

and recognized that they involved coded discussion of narcotics
trafficking.  For example, on July 29, 2017, at approximately 5:45
p.m., during an incoming call from **Subject Telephone 2** to "Chris" at
one of the target phones (818 438 2767), TOMASOVICH referred to
himself at the outset of the call as "Trent" (i.e., TOMASOVICH's
first name).  TOMASOVICH told Chris that he (TOMASOVICH) needed
"four halves and a 20."  Chris asked if TOMASOVICH's address was the
same, and TOMASOVICH confirmed it was the corner of "Ostego and
Sepulveda" (TOMASOVICH's residence, 5112 Sepulveda Boulevard,
Apartment #223, in Sherman Oaks, California, is in fact located on
Sepulveda Boulevard between Otsego Street and Hartsook Street).
Chris confirmed that he had lots of people but would be there.
Based on my training and experience, I recognize that in this call,
TOMASOVICH was ordering heroin from Chris, and Chris agreed to
deliver the heroin to TOMASOVICH's residence after he completed
deliveries to his other customers.  I observed dozens of similar
communications throughout the interception periods, including
communications in which TOMASOVICH referred to the ordered drugs by
what I recognize to be code words such as "black" (black tar heroin)
and "balloons" (balloons containing heroin).  I also recognize from
the linesheets that TOMASOVICH was ordering distribution quantities
of heroin (i.e., more than for his own personal use), such as an
October 20, 2017 communication in which TOMASOVICH ordered 300
balloons, in addition to 20 units of "soda" (cocaine).

          b.    In early January 2018, an undercover ("UC") officer
with the Glendale Police Department ("GPD") arranged to purchase
heroin from a dealer advertising the sale of the drug on Craigslist,
later identified as TOMASOVICH.

1          i.   On January 5, 2018, the UC conducted an

2  undercover buy of heroin from an unidentified male that TOMASOVICH

3  directed to meet with the UC to complete the exchange.   On January

4  11, 2018, the Honorable Judge Beverly Bourne of the Los Angeles

5  Superior Court of California issued a search for TOMASOVICH's

6  residence located at 5112 Sepulveda Boulevard, #223, in Los Angeles,

7  California and a black Lexus four door sedan bearing California

8  license plate #7ZRL033.

9          ii.   On January 16, 2018, at approximately 9:20 a.m.,

10 the UC contacted TOMASOVICH, via text on the phone number 818-310-

11 0294, and TOMASOVICH direct the UC to meet with him (TOMASOVICH)

12 across the street from 5112 Sepulveda Boulevard (near TOMASOVICH's

13 residence) to purchase a gram of heroin for $80.   (Although the

14 phone number used to contact TOMASOVICH was not **Subject Telephone 2**,

15 I believe that this is likely because TOMASOVICH was using a Voice

16 over Internet Protocol ("VoIP") telephone number which acted as a

17 "burner" cellphone.   During an interview with GPD detectives, and

18 after he had been advised of his <u>Miranda</u> rights, TOMASOVICH referred

19 to a Samsung cellphone found in his possession at the time of his

20 arrest as his "burner phone."   Although GPD detectives did not find

21 other cellphones in TOMASOVICH's possession at the time of his

22 arrest, the GPD records of the arrest reflect that TOMASOVICH

23 identified **Subject Telephone 2** as his phone number.   (In other

24 words, I believe that the Samsung phone found in TOMASOVICH's

25 possession was likely **Subject Telephone 2**, and that TOMASOVICH was

26 also using the same cellular device for drug-related communications

27 with other VoIP phone number(s) such as the one he used to

28 communicate with the UC.)

iii. At approximately 11:15 a.m., the UC observed TOMASOVICH walk to the front of the meet location and observed TOMASOVICH enter a black Lexus sedan.  The UC and TOMASOVICH made eye contact and the UC walked over to TOMASOVICH's vehicle. TOMASOVICH directed the UC get into the front seat of the vehicle to conduct the transaction to which the UC opened the front door and leaned in.  The UC pulled the $80 from his/her pocket and gave it to TOMASOVICH.  TOMASOVICH again directed the UC to get into the vehicle as it was less "sketchy" to do the deal in the vehicle. TOMASOVICH handed the UC a small Ziploc bag with a brown substance resembling heroin.  TOMASOVICH was thereafter arrested and an additional small Ziploc bag of brown substance resembling heroin was seized from his person.  During the search of TOMASOVICH's residence, officers seized, among other things, three Ziploc bags and a plastic container each containing a brown substance resembling heroin, several broken Xanax pills, and two digital scales.

iv. TOMASOVICH was arrested and charged with violating California Health and Safety Code Section 11351(a) (possession for sale of a controlled substance); TOMASOVICH's girlfriend, Tamara Elkadi, who was present at the residence, was also cited and released for California Health and Safety Code Section 11350(a) (possession of a controlled substance).  On May 15, 2018, TOMASOVICH was convicted of California Health and Safety Code Sections 11352(a) and 11351; he received three years' formal probation and 180 days jail.

c. Additionally, on November 17, 2018, TOMASOVICH was arrested by Ventura County Sheriff's Department ("VCSD") deputies. During the arrest, the officers seized a black Samsung phone from

1   TOMASOVICH, and the underlying arrest records once reflect that

2   TOMASOVICH's phone number is **Subject Telephone 2** (310-990-6424).

3         i.   On November 17, 2018, VCSD deputies in a marked

4   patrol unit were operating in Thousand Oaks, California.  At

5   approximately 7:46 p.m., dispatch advised that a reporting party

6   heard two male subjects yelling and screaming in front of a house to

7   "jack them" and "stab him."  Deputies arrived to the location of the

8   reported incident, 3480 Brokenhill Street in Thousand Oaks, and

9   observed a silver Lexus sport utility vehicle departing the area.

10  The patrol unit conducted a traffic stop on the vehicle.

11        ii.  Deputy Mark Plassmeyer (#4691) contacted the

12  driver, later identified as TOMASOVICH, while Deputy Cameron

13  Simpkins (#5032) contacted the passenger, later identified as Tamara

14  Elkadi (who, as described above, was present at TOMASOVICH's

15  apartment during the search warrant executed at the location in

16  January 2018).  Deputy Plassmeyer observed TOMASOVICH to be very

17  nervous, a stuttered speech and sweating.  TOMASOVICH initially

18  provided Deputy Plassmeyer a false name ("Ryan Pulaski"), which he

19  spelled "Ryan Pierlaskvich," and provided false date of birth ("9-8-

20  1991").  TOMASOVICH told Deputy Plassmeyer thata person named "Aaron

21  Winkeler," at the 3480 Brokenhill Street residence, had stolen money

22  from him (TOMASOVICH).  TOMASOVICH stated that Winkeler took

23  TOMASOVICH's wallet from the center console of the vehicle and ran

24  inside the residence.  Deputy Plassmeyer observed that TOMASOVICH's

25  story was changing as he was telling it and detained TOMASOVICH.

26        iii. Deputy Plassmeyer advised TOMASOVICH that he

27  could locate no records for a person with the name of "Ryan

28  Pierlaskvich," in response to which TOMASOVICH identified himself by

9

another false name ("Will Myers") and date of birth ("8-14-1990"). The deputy then advised that he could locate no records for that person either, in response to which TOMASOVICH admitted that his name was "Trent TOMASOVICH" and date of birth is "4-29-1991." TOMASOVICH stated that he lied about his identity because he was on probation for possession and intent to sell (drugs). TOMASOVICH later stated that his identification was inside his wallet which was still in the vehicle and that he (TOMASOVICH) lied about Winkeler stealing his wallet. Elkadi also identified herself to the deputies by several false names.

iv. On searching for TOMASOVICH's wallet in the car, the deputies observed narcotics and drug paraphernalia in plain view within the vehicle, following which the deputies conducted an automobile search. They found, among other things, approximately $838 cash in TOMASOVICH's wallet; hypodermic syringes; a white crystalline substance believed to be methamphetamine; plastic straws with brownish apparent drug residue in it; small portable scale; small plastic bag with various pharmaceutical pills; and a large piece of aluminum foil with dark brown apparent drug residue. They also found, within the car, a blue backpack that contained a small bag of suspected light brown powder heroin, a portable scale and small quantities of suspected methamphetamine and pills; a purse that contained small pieces of tin foil, small plastic bags, a rubber container with one broken pill; and four plastic containers that held a black tar substance (apparent heroin), white crystal like substance (apparent methamphetamine), and a white rocked substance (apparent crack cocaine).

1        d.    Deputy Plassmeyer contacted Winkeler at his

2   residence. Winkeler that he was "detoxing" from a fentanyl addiction

3   and had contacted TOMASOVICH to buy drugs via the Facebook Messenger

4   communication service.   Winkeler ultimately decided not to go

5   forward with the transaction.   After TOMASOVICH and Elkadi had

6   arrived, Winkeler asked his father to have them leave, which led to

7   the confrontation that resulted in the deputies' arrival.

8        e.    Deputy Plassmeyer interviewed TOMASOVICH after

9   advising TOMASOVICH of his Miranda rights.   TOMASOVICH told Deputy

10  Plassmeyer that the blue backpack was his, along with a small black

11  case that contained pills and tweezers belonged to him.   Deputy

12  Plassmeyer asked about the container of suspected methamphetamine to

13  which TOMASOVICH the container possibly belonged to him and Elkadi,

14  but that he was not certain.   TOMASOVICH did not give consent to his

15  cellphone.

16       f.    Deputy Simpkins interviewed Elkadi after advising her

17  of her Miranda rights.   She explained that the substances (in the

18  purse) were Xanax, methamphetamine and heroin.   Elkadi stated "that

19  we're selling" (ELKADI and TOMASOVICH).   Elkadi gave Deputy Simpkins

20  permission to examine the contents of phone; Deputy Simpkins

21  observed multiple messages from unknown individuals asking for

22  "clear" (suspected code for methamphetamine) and offering "clear" or

23  a "g" (gram) for a set amount of money, along with records of

24  Craigslist postings advertising "White China Dishes" (code for

25  "china white," that is, fentanyl powder or fentanyl/heroin powder)

26  and "Full $one60" and "Half $80" (offering one gram of fentanyl for

27  $160 and 1/2 gram for $80).

28

1      g.    Sheriff's Deputies arrested and charged TOMASOVICH

2 and Elkadi with violating various California drug and false

3 statement statutes.   Both TOMASOVICH and Elkadi were later released,

4 and the charges against them remain pending.

5      C.   Deaths of Montgomery and Flynn on July 14, 2018

6      12.   On July 14, 2018, at approximately 3:00 a.m., Los Angeles

7 Police Department ("LAPD") Officers Martinez (#42439) and Ramirez

8 (#42446) responded to a radio call of an ambulance overdose at 22809

9 Del Valle Street, Unit #10, in Woodland Hills, California 91364.

10 Prior to LAPD Officers Martinez and Ramirez arriving at the

11 residence, officers were advised that the individual, Grace

12 Montgomery, had been transported to the West Hills Hospital, located

13 in West Hills, California.   Upon arrival at the Hospital, LAPD

14 Officers were advised that the decedent, Montgomery, had been

15 pronounced dead at approximately 3:26 a.m.

16      13.   LAPD Officers spoke with Los Angeles Fire Department

17 Rescue Paramedic Morales (#41741) who was at 22809 Del Valle Street,

18 Unit #10, in Woodland Hills, California 91364.   Morales informed

19 LAPD officers that he responded to the residence at approximately

20 2:40 a.m. in response to an emergency all that was initiated at

21 approximately 2:32 a.m., Morales further informed the officers that

22 he observed that Montgomery produced a snoring respiration (i.e.,

23 indicating that she was alive at the time), and that the paramedics

24 then began to work on Montgomery resulting in slight positive signs,

25 following which Montgomery was transported to the West Hills

26 Hospital.   Morales also advised Officers that he (Morales) observed

27 drug paraphernalia in the general vicinity of Montgomery inside the

28 bathroom where Montgomery was found.

14.   Officers spoke to Kristin White, who had reported the incident.   White told LAPD officers that she and Montgomery had known each other for approximately one year and had met each other at an eating disorder rehabilitation center.   White stated that Montgomery had texted her (White) earlier in the morning that she wanted to use heroin even though Montgomery had reached one year of being sober from heroin use.   White invited Montgomery to her residence (22809 Del Valle Street, Unit #10, in Woodland Hills, California 91364) as a way to support each other since she (White) was also a recovering alcoholic.   White stated that she eventually got drunk and the last time she saw Montgomery was around midnight. At approximately 2:00 a.m., White discovered Montgomery leaning over the toilet in the first floor bathroom with blood on her nose and unconscious.   White told LAPD Officers that she immediately called 911.   Toxicology results revealed that Montgomery had died of an accidental overdose caused by fentanyl.   The level of fentanyl was fatal and was determined to have caused Montgomery's death.

15.   On the same date, at approximately 8:21 a.m., LAPD Patrol Officers Hall (#41496) and Gryglewski (#41763) received a radio call for an "Overdose/Death Investigation" at 22809 Del Valle Street, Unit #10, in Woodland Hills, California 91364.   LAPD Officers met with Los Angeles Fire Department ("LAFD") Rescue Paramedic Morales (#41741) who advised Officers that they had received a call for a possible overdose.   Upon their (LAFD) arrival, they observed the subject, later identified as Ian Flynn, lying on the couch.   LAFD Rescue observed that Flynn was unconscious and not breathing. LAFD Rescue attempted to revive the Flynn but were unsuccessful.   Rescue Paramedic Morales told LAPD Officers that he (Morales) pronounced

13

1   Flynn's death at 8:23 a.m.  Morales advised LAPD Officers that they
2   had taken another individual, Montgomery, from the same residence
3   earlier in the night, to West Hills Hospital for a drug overdose.
4   LAPD Officers Hall and Gryglewski met with White who reported Flynn
5   to emergency officials.  White told Officers that Flynn was her
6   boyfriend and that her friend, Montgomery, had been transported to
7   the hospital from the same residence earlier for a drug overdose.
8   White stated that she last spoke to Flynn when he was in the
9   downstairs living room (in the residence) while he (Flynn) sat on
10  the couch.  White told LAPD Officers that Flynn had a clear plastic
11  bag with an unknown substance in it and had made a comment (to
12  White) "your friend had money. This isn't heroin. This is 'China'."
13  (From my training and experience, I recognize that the term "China"
14  refers to "China white," which is common slang for white fentanyl
15  powder or for fentanyl powder cut with heroin.)   White told Flynn
16  to throw "it" (the substance in the clear bag) away and went
17  upstairs at approximately 6:00 a.m.  At approximately 8:00 a.m.,
18  White said she was awoken by Flynn's alarm clock and came downstairs
19  to tell Flynn to shut his alarm off.  White stated that she found
20  Flynn lying on the couch unresponsive and called LAFD. Toxicology
21  results revealed that Flynn had died of an accidental overdose
22  caused by the combined effects of fentanyl and ethanol; the level of
23  fentanyl was fatal and was determined to have caused Flynn's death.

24      D.   Search of Subject Telephone 1

25      16.  On August 7, 2018, LAPD detectives were given consent by
26  Montgomery's father, Michael Montgomery, to search Montgomery's
27  cellular phone.  Upon review of the photos of text messages from
28  Montgomery's phone and data taken from Montgomery's text message

14

1  chats with **Subject Telephone 5,** exchanged with an individual

2  referred on the phone contacts to as "Joe," who I believe to be

3  Joseph Anthony CAMPBELL.   I observed the following text

4  communication between CAMPBELL and Montgomery, with notes of my

5  interpretation of coded/shorthand drug references added in

6  parentheticals:

7          a.   July 13, 2018, at approximately 11:22 a.m., the

8  following text message conversation took place:

9          Montgomery: Hey it's Grace

10         CAMPBELL: Omg hi my love. What's up

11         Montgomery: Heyyyy so I I'm wondering if you know where to

12              find black (heroin) in the valley area

13         CAMPBELL: Yeah and fet. (fentanyl) Off supulveda. My buddy

14              lives in the apartments off supulveda and Hartsook across

15              from a liquor store called oak liquor.

16         CAMPBELL: I'' txt him rn and tell him I'm shooting u his

17              number.

18         . . .

19         CAMPBELL: He's reliable as fuck and a good friend of mine

20         Montgomery: Ok awesome thanks so much. How much for a g

21              (gram) usually.

22         CAMPBELL: 80-90 I believe,

23

24         b.   On July 13, 2018, at approximately 4:20 p.m., the

25  following text message conversation took place:

26         Montgomery: Joeeeee what's his number. Omg you look so

27              good btw.

28         CAMPBELL: Trent But My Francis (**Subject Telephone 2**)

15

1    Montgomery: Please excuse my terrible hangover face.

2    CAMPBELL: Awe thanks babe stfu u look great.

3    CAMPBELL: When u txt Trent just say he Trent this is joes

4    friend grace he said you could probably help me out. Send

5    that selfie of me with the pic along with a screen shot of

6    your fb.

7

8        c.   On July 13, 2018, at approximately 4:20 p.m., the

9    following text message conversation continued:

10    Montgomery: Girl you do china white (fentanyl)?? He says

11    he doesn't have black (heroin)

12    CAMPBELL: It's bomb. Get Fet. (fentanyl)

13    Montgomery: Haha okkk. I though you could only shoot or

14    snort white (fentanyl) tho I love to smoke shitttttt.

15

16        b.   Based on my training, experience, and knowledge of

17   this investigation, I believe the following regarding the above

18   messages.  The July 13 conversation between Montgomery and CAMPBELL

19   begins with Montgomery, using **Subject Telephone 1,** reaching out to

20   CAMPBELL, using **Subject Telephone 5,** to see if he (CAMPBELL) knows

21   of anyone that sells "black" in the valley, which I believe to be a

22   coded word for heroin.  CAMPBELL replies to Montgomery and tells her

23   that he knows someone that sells heroin and "fet" which I believe to

24   be fentanyl.  CAMPBELL provides the contact name "Trent But My

25   Francis" with an attached contact telephone number of "310-990-6424"

26   (**Subject Telephone 2**), whom I believe to be Trent Michael

27   TOMASOVICH.  CAMPBELL further described that the individual that had

28   the supply of fentanyl lived in an apartment off of "Supulveda and

16

1  Hartsook" across from a liquor store with signage identifying it as
2  "Oaks Liquor Market". CAMPBELL instructed Montgomery to text
3  TOMASOVICH that he (CAMPBELL) was her reference along with sending a
4  screenshot photo of their conversation (Montgomery and CAMPBELL)
5  which included a photo of CAMPBELL.
6        c.   Upon review of California Department of Motor Vehicle
7  ("DMV") database, a California DMV Driver License for Trent Michael
8  TOMASOVICH (E1128328) has a listed address of 5112 Sepulveda
9  Boulevard, Apartment #223, in Sherman Oaks, California 91403, this
10 address is an apartment within a building located on the corner of
11 Sepulveda Boulevard and Hartsook Street, which matches the
12 description of the residence of the fentanyl supplier discussed in
13 the above messages. Similarly, the Oak Liquor store is located at
14 5148 Sepulveda Boulevard in Sherman Oaks, CA 94103, which is thus
15 also consistent with the above line of communications.
16        d.   Moreover, the summary of other law enforcement
17 investigations of TOMASOVICH independently corroborate his use of
18 **Subject Telephone 2** to engage in narcotics trafficking, and that
19 TOMASOVICH sells narcotics in and near the vicinity of his Sherman
20 Oaks residence. Moreover, regarding TOMASOVICH's arrest following
21 his sale of heroin to a UC officer in January 2018, during
22 communication between the UC and TOMASOVICH, TOMASOVICH provided the
23 name "Francis" to the UC; the name "Francis" is similar to the name
24 that CAMPBELL provided to Montgomery, "Trent But My Francis."
25        E.   Conversations between **Subject Telephones 1 and 2**
26        17.  As noted above, I believe that during a July 13 series of
27 communications, CAMPBELL referred Montgomery to TOMASOVACH via
28 **Subject Telephone 2** as a source to acquire fentanyl; the phone

1  number was saved in CAMPBELL's phone contacts under the name "Trent

2  But My Francis."  I observed the following text message

3  communications between Montgomery (**Subject Telephone 1**) and

4  TOMASOVICH (**Subject Telephone 2**):

5         a.  On July 13, 2018, at approximately 5:05 p.m., the

6  following text message conversation took place:

7         Montgomery: Hey this is joes friend I wanted to get

8         something tonight.

9         TOMASOVICH: Have you hit me up before.

10        Montgomery: No. He just called me and said it was cool to

11        text you. He's like my best friend.

12        TOMASOVICH: No that's fine I was just curious if it was

13        the same person that hit me up before that he sent me. OK

14        well let's start here wuts [what's] your name nd [and] you

15        have a Facebook or Instagram.

16        Montgomery: Grace and my ig [Instragram] is

17        @gracemontgomery_

18        TOMASOVICH: Ok. You model??? That's you? Nd not saying I

19        can but if I were able to wut are you looking to get?

20        Montgomery: Ya that's me. I wanted to get a g of black.

21        TOMASOVICH: How long you been using and or how much clean

22        time to you have.

23        Montgomery: Been using a couple years but been clean a

24        year until like a week ago. So many questions haha.

25        TOMASOVICH: Lol well yea you can never be to careful

26        especially when the homie who t

27

28

18

1    Montgomery: Haha true. So did I pass your test or do you

2    have more questions haha. Lemme know if you can get that

3    for me.

4    TOMASOVICH: Lol so far your good..But yea Can never be too

5    careful especially when the person you fit the number from

6    didn't givr [give] me a heads up. Last little question you

7    a smoker of shooter.

8    Montgomery: Sorry he told me he told you. Smoke.

9

10   [AGENT Note: Montgomery sent a screen shot of a

11   conversation with CAMPBELL to which CAMPBELL sent his

12   phone contact for TOMASOVICH "Trent But My Francis"].

13

14   TOMASOVICH: Ok well i can possibly help you out it just

15   depends cause if you want black specifically your S.O.L,

16   but if you want the 1000 X better version of it I can do

17   so. I have China it's just a wee bit more expensive but

18   it's a lot stronger and yea I do in fact mean a lot

19   stronger.

20   Montgomery: Can I smoke it.

21   TOMASOVICH: Yep. Nd you can try it too.

22   Montgomery: Ok I'm down how much. And when

23

24        b.   On the same date, at approximately 6:45 p.m., the

25   following text message conversation took place between **Subject**

26   **Telephone 1** and **Subject Telephone 2**:

27   TOMASOVICH: Sry for late response. So I'm upping now and

28   it's 160 for the full 80 for the half. Like I said before

19

1   I know that seems like a lot but just wait to meet up and
2   try it you don't want it you don't have to get it but I
3   guarantee you your gonna by the g and make sure that this
4   is usually available.
5   Montgomery: Ok. And do you never have black? I'll prob get
6   the half tonight I don't get paid for a couple days.
7   TOMASOVICH: Used to and then switched immediately over.
8   This is way more clean more potent a half will last you
9   till you get paid for sure.
10  Montgomery: Ok dopeee. I'll hit you up once I'm off work
11  and meet you where ever is good for you. Definitely do
12  what you gotta go I'm not trippin, I just work as a night
13  manager at a sober living and I work tonight to the sooner
14  is better but I'll meet you wherever :)
15
16      c.   On the same date, at approximately 9:17 p.m., the
17  following text message conversation took place between **Subject**
18  **Telephone 1** and **Subject Telephone 2**:
19  Montgomery: Address? Cuz it'll take me like 20 min to get
20  to Sherman oaks. The 405 and the 101 where.
21  TOMASOVICH: Ok go to castle park. It's on sepulveda.
22  Montgomery: Ok. Ok I'll be there in like 20 is that chill.
23  TOMASOVICH: Yea
24  Montgomery: Omg it's packed haha. Well I'm here.
25  TOMASOVICH: Yea it's Friday night. Ok well I'll hit you up
26  in a minute.
27  Montgomery: Ok.
28  TOMASOVICH: On the way back I'll hit you up asap.

1    Montgomery: How long.

2    TOMASOVICH: 20-25 min

3    Montgomery: Ahhhh. Okk

4    TOMASOVICH: Ya sry that's why I said I would hit you up

5    when I was heading f back. Anyway go to the McDonald's on

6    ventura as of your heading back home.

7    Montgomery: Ok

8    Montgomery: Ok. You there?

9    TOMASOVICH: Will be

10

11       18.   Based on my training, experience, and knowledge of this

12   investigation, I believe the following regarding the above

13   conversation. The July 13 conversation between Montgomery, using

14   **Subject Telephone 1**, and TOMASOVICH, using **Subject Telephone 2**,

15   begins with Montgomery introducing herself as Joe's friend (Joseph

16   CAMPBELL). I further believe that TOMASOVICH asked Montgomery to

17   identify herself via a photo through Facebook or Instagram to ensure

18   that Montgomery was not an undercover law enforcement officer.

19   Montgomery told TOMASOVICH that she "wanted to get a 'g' of black"

20   which I believe referred to one gram of heroin.  TOMASOVICH

21   continued to ask Montgomery if she was a "smoker" or "shooter" (if

22   she inhaled or injected heroin) to which Montgomery replied "smoke."

23   The conversation continued with TOMASOVICH explaining to Montgomery

24   that if she wanted to purchase "black specifically" (heroin) then

25   she was "S.O.L" (shit out of luck) but if "you want the 1000 x

26   better version it I can do so."  I believe that TOMASOVICH was

27   referring fentanyl with the latter comment, which is fifty times

28   more powerful than heroin.  In addition, when TOMASOVICH stated that

he has "China it's just a wee bit more expensive but it's a lot stronger and yea I do in fact mean a lot stronger," I believe TOMASOVICH was attempting to explain that the fentanyl that TOMASOVACH had sold for a higher price but was also significantly stronger than heroin. TOMASOVICH told Montgomery that she could smoke "it" (fentanyl) to which Montgomery acknowledged "ok I'm down" and "how much."

       a.    I further recognize that the conversation continued with TOMASOVICH stating to Montgomery that he was "upping now" (acquiring additional narcotics to his supply) and that the price was "160 for the full" ($160 for a gram of fentanyl) and "80 for the half" ($80 for a ½ gram of fentanyl). TOMASOVICH further told Montgomery that she could "try it" (sample the fentanyl prior to purchasing any fentanyl from TOMASOVICH) and if she did not want "it" (fentanyl) than she did not have to "get it but I [TOMASOVICH] guarantee you your [you, you are] gonna by [going to buy] the g [gram]." I believe TOMASOVICH was advertising the quality of his narcotics product to Montgomery and once she sampled a portion of the fentanyl, she (Montgomery) would purchase the full gram for $160. Montgomery and TOMASOVICH continued to text over **Subject Telephones 1-2** and arranged to meet and exchange a payment for fentanyl.

       b.    TOMASOVICH instructed Montgomery to meet him at "castle park. It's on Sepulveda" to carry out the deal. I believe this referred to carrying out the fentanyl transaction at the family entertainment center Castle Park located at 4989 Sepulveda Boulevard in Sherman Oaks, less than half a mile from TOMASOVICH's residence.

1      19.   Upon review of the call log from Montgomery's phone,

2  TOMASOVICH (**Subject Telephone 2**) called Montgomery (**Subject**

3  **Telephone 1**) on July 13, 2018, at 11:16 p.m.  The duration of that

4  call was approximately 37 seconds.  From 9:08 p.m. through 11:19

5  p.m., on the same day, **Subject Telephone 1** placed 4 outgoing calls

6  to **Subject Telephone 2**.  I believe that these calls were to

7  coordinate meeting at Castle Park to complete the fentanyl

8  transaction.

9      D.   Interview of Kristin White on August 13, 2018

10      20.   On August 13, 2018, LAPD Detectives Santana and Moselle

11  interviewed Kristin White.  White informed Detectives that

12  Montgomery had texted her (White) via White's phone, **Subject**

13  **Telephone 3**, at approximately 10:00 p.m. on July 13, 2018.   White

14  told Detectives that she (White) was drunk when Montgomery arrived

15  at White's residence, 22809 Del Valle Street, #10, in Woodland

16  Hills, California 91364.  White and Montgomery went to Taco Bell to

17  get food; Montgomery drove as she (White) was too intoxicated to

18  drive to Taco Bell.  White said that they (White and Montgomery)

19  went through the Taco Bell drive through and then returned to

20  White's residence and she (White) passed out on the couch.  White

21  woke up around 2:30 a.m. and found Montgomery in the bathroom

22  unconscious to which she called "911."  When paramedics arrived,

23  White told Detectives that she had called her boyfriend, Ian Flynn,

24  and told him that Montgomery was overdosing.  White stated that

25  Flynn arrived at her residence before paramedics took Montgomery to

26  the hospital.  White and Flynn went to the hospital and returned to

27  White's residence at approximate 5:00 a.m.

28

21.   At approximately 5:40 a.m., Flynn told White, "your friend has money this is China white" (believed to be fentanyl).   White told Flynn to throw "it" (fentanyl) away and to go to bed.   White explained to Detectives that she heard Flynn's alarm going off and found him on the couch unresponsive to which she called "911." White further stated to Detectives that a few days after Montgomery died, White was looking through her phone (**Subject Telephone 3**). White observed photos of screen shots that she (White) had taken of Montgomery's phone (**Subject Telephone 1**) of text conversations between Montgomery (**Subject Telephone 1**) and Joe (CAMPBELL) (**Subject Telephone 5**) discussing the purchase of drugs.   White told Detectives that she recognized the name "Joe" (believed to be CAMPBELL) as a guy they (Montgomery and White) met in Prominence and that Joe was a heroin user.   White informed LAPD Detectives that she believed that "Joe" was the middleman and he gave Montgomery the connection to buy drugs.   White provided these screen shots of the text messages between CAMPBELL and Montgomery to LAPD Detectives.

E.   Surveillance Video of Castle Park

22.   On August 14, 2018, Montgomery's father, Michael Montgomery, provided LAPD Van Nuys Homicide Detectives an email with a photo of Grace Montgomery's black Volkswagen bearing California license plate# 7UHV343.   Upon review of the Castle Park still surveillance photo shots of the parking lot, a dark vehicle can be observed arriving and parking in a parking stall within the lot. Based on my observations of the photos, although grainy, it appears that the dark vehicle resembles the photo of Montgomery's black Volkswagen vehicle that had been provided to LAPD Homicide Detectives by Michael Montgomery.   Additionally, the vehicle appears

1   to have a passenger located in the front passenger seat area of the

2   vehicle as the vehicle arrives and parks into a parking stall.

3        23.   Based on my experience and knowledge of this

4   investigation, I believe that White was present and within the

5   vicinity of Montgomery during the drug transaction between

6   Montgomery and TOMASOVICH.   Additionally, White was present at her

7   (White's) residence during which both Montgomery and Flynn's

8   overdoses that resulted in death.

9        24.   Agents believe any of the known members of TOMASOVICH's

10   DTO, including TOMASOVICH (the user of **Subject Telephone 2**) and

11   CAMPBELL (the user of **Subject Telephone 5**) may have played a role in

12   supplying the drugs found near Montgomery and Flynn the day that

13   they both overdosed.   Based on the evidence described above, I

14   respectfully submit that the requested information regarding the

15   **Subject Telephones** will provide evidence of the Target Subjects'

16   commission of the Target Offenses.

17               IV. GROUNDS FOR SEALING AND DELAYING NOTICE

18        25.   Based on my training and experience and my investigation

19   of this matter, I believe that reasonable cause exists to seal this

20   application and warrant, as well as the return to the warrant.   I

21   also believe that reasonable cause exists, pursuant to 18 U.S.C.

22   § 2705(b), to enter an order commanding the Carriers not to notify

23   any person, including the subscriber(s) of the **Subject Telephones**,

24   of the existence of the warrant until further order of the Court,

25   until written notice is provided by the United States Attorney's

26   Office that nondisclosure is no longer required, or until one year

27   from the date the Carriers comply with the warrant or such later

28   date as may be set by the Court upon application for an extension by

1 | the United States.  There is reason to believe that such
2 | notification will result in: (1) flight from prosecution;
3 | (2) destruction of or tampering with evidence; (3) intimidation of
4 | potential witnesses; or (5) otherwise seriously jeopardizing the
5 | investigation.  The investigation in this matter is not public or
6 | otherwise known to its targets.  Moreover, investigators hope to
7 | execute future search warrants at locations utilized by MAYERS' DTO
8 | to further their narcotics distribution efforts.
9 | ///

*for 3003j cell phone # and*
*from July 10 to 17, 2018 for*
*the other Subject telephones*

1    V.   CONCLUSION/

2    26.   For all of the above reasons, there is probable cause to

3    believe that cell-site information related to the **Subject Telephones**

4    from July 10, 2018 through the present will constitute or yield

5    evidence of violations of the Target Offenses that were committed by

6    the Target Subjects.  I seek historical cell site data through the

7    present because (1) of evidence that the trafficking activity is

8    ongoing and broad in scope, and (2) to provide evidence of locations

9    frequented by the targets of the investigation, to allow

10   investigators to identify any stash locations, source locations, or

11   otherwise to provide evidence supporting surveillances and search

12   warrants.

13

14                                              /s/
                                      _____

15                                      Lindsay T. Burns
                                        Special Agent, Drug

16                                      Enforcement Administration

17   Subscribed to and sworn before me
     this  4k  day of ~~December, 2018.~~

18                        January, 2019

19        JEAN P. ROSENBLUTH

20   UNITED STATES MAGISTRATE JUDGE

21

22        JEAN P. ROSENBLUTH

23

24

25

26

27

28